IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PHL VARIABLE INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. |
| | ) |
| ESF QIF TRUST, by and through its trustee, | ) |
| DEUTSCHE BANK TRUST COMPANY, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff PHL Variable Insurance Company ("Phoenix"), by and through its attorneys, files this Complaint against the ESF QIF Trust ("ESF Trust"), by and through its trustee, Deutsche Bank Trust Company ("Deutsche Bank") as follows:

1. This is an action for Declaratory Judgment under 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Phoenix seeks to adjudicate its rights and obligations under a policy of life insurance bearing the number 97519439 (the "Policy") insuring the life of John Szalay ("Mr. Szalay"). Specifically, Phoenix seeks a declaration that the Policy is null and void *ab initio* due to the lack of an insurable interest at the Policy's issuance.

## THE PARTIES

2. PHL Variable Insurance Company is a Connecticut insurance company authorized to transact the business of insurance in Delaware. Phoenix is organized under the laws of Connecticut with its principal place of business in Hartford, Connecticut. Phoenix's headquarters are located at One American Row, Hartford, Connecticut 06102–5056. Phoenix's high level officers direct, control and coordinate the corporation's activities from Hartford, Connecticut. As such, Phoenix is a citizen of the State of Connecticut within the meaning and intent of 28 U.S.C. § 1332.

3. The ESF QIF Trust is a Delaware statutory trust formed pursuant to the Delaware Statutory Trust Act, 12 Del. C. §§ 3801, *et seq.* and is a citizen of Delaware within the meaning and intent of 28 U.S.C. § 1332. The trust may be served through its trustee, Deutsche Bank Trust Company at 1011 Centre Road, Suite 200, Wilmington, Delaware 19805.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over all parties of this lawsuit under 28 U.S.C. § 1332(a)(1) because Phoenix and the ESF Trust are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of attorneys' fees, interest and costs. The ESF Trust is subject to the personal jurisdiction of this Court.

5. This Court has jurisdiction for the declaratory judgment action pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202, which grant the United States District Courts jurisdiction to declare the "rights and other legal relations of any interested party making such declaration, whether or not further relief is or could be sought."

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), because the ESF Trust resides in this District and all or a substantial portion of the events or omissions giving rise to the cause asserted herein took place in the State of Delaware. Additionally, the Policy was issued in Delaware and is governed by Delaware law.

## FACTUAL BACKGROUND

### A. Stranger Originated Life Insurance

7. In recent years, a derivative market for life insurance has developed in which existing life insurance policies and certificates are sold to third parties who lack an insurable interest in the life of the insured. Typically referred to as a "life settlement", these sales are

generally lawful, assuming that the policy was procured for legitimate purposes and that there was an insurable interest at the policy's inception.

8. As this derivative market has developed however, there has been a proliferation of life insurance policies that are not sought for legitimate insurance needs, but rather for re-sale to strangers in the secondary market. Policies procured under these circumstances have become known as stranger originated life insurance ("STOLI") policies. STOLI policies are illegal wagering contracts that lack an insurable interest at inception. As such, STOLI policies are void *ab initio*.

9. Although the STOLI market has only recently come into existence, the underlying concept has persisted for over a century. Indeed, in the late nineteenth and early twentieth centuries, both the Delaware Supreme Court and the United States Supreme Court opined against unlawful "wagering contracts," and the "sinister counter interest" in the death of the insured that results from the issuance of such policies.[1] In an effort to prevent investors from speculating on the lives of others, many states have enacted insurable interest laws to protect the integrity of life insurance by requiring that a policy owner have a cognizable interest in the longevity of the

---

[1] *See Grisby v. Russell*, 222 U.S. 149, 154–55 (1911) (explaining that an insurance policy lacking an insurable interest at inception merely serves as a cover for a "pure wager," which contradicts the precise purpose of a life insurance policy because it "gives the [policyholder] a sinister counter interest in having the insured's life come to an end."); *Warnock v. Davis*, 104 U.S. 775, 779 (1881) (condemning wagering contracts because they "have a tendency to create a desire for the [death of the insured] and are, therefore, independently of any statute on the subject, condemned, as being against public policy."); *see also Baltimore Life Ins. Co. v. Floyd*, 91 A. 653, 656 (Del. 1914) ("Insurance procured upon a life by one or in favor of one under circumstances of speculation or hazard amounts to a wager contract and is therefore void."). Indeed, the Delaware Supreme Court recently reaffirmed Delaware's longstanding prohibition against wagering contracts lacking an insurable interest. *See PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust, ex rel. Christiana Bank & Trust Co.*, 28 A.3d 1059, 1067–1068 (Del. 2011) ("Under Delaware common law, if a life insurance policy lacks an insurable interest at inception, it is void *ab initio* because it violates Delaware's clear public policy against wagering.").

insured at the time the policy is issued. However, STOLI promoters have attempted to circumvent these laws by carefully constructing their transactions to hide the fact that the policies are not being procured to satisfy legitimate insurance needs, but instead are being procured as impermissible wagers.

10. In order to maximize their potential return on investment, STOLI promoters will seek out individuals aged seventy years or older who are purportedly financially qualified for high face amount insurance policies. This in turn allows STOLI promoters to multi-million dollar life insurance policies on individuals who, actuarially speaking, are expected to have a relatively limited lifespan. The perverse result is that the shorter life expectancy of these individuals makes them a more attractive investment to those who would gamble on the lives of these insureds.

11. In many cases, STOLI policies are initiated with fraudulent representations on the insurance application. Insurers will not issue coverage unless there is a legitimate need for the insurance applied for, such as estate conservation or income replacement. As such, insurers, in an effort to prevent issuing STOLI policies, require insurance applicants to respond to specific questions during the application process regarding the insured's net worth and income, the purpose of the insurance sought, any intent to transfer the policy, and the funding source of policy premiums. STOLI promoters and insureds will falsely answer these questions in order to obtain the insurance sought. Additionally, in order to maximize their profit and/or to obtain high-face amount policies insuring individuals not qualified for such policies, STOLI promoters and insureds frequently provide insurers with false information regarding an insured's financial status.

12. In furtherance of a STOLI scheme, the John Szalay Insurance Trust III (the "Trust"), by and through its trustee, Jonathan S. Berck ("Berck"), procured the Policy from Phoenix. In doing so, STOLI promoters caused the establishment of the Trust to give the false appearance that the Policy was being purchased for legitimate estate planning purposes. In fact, the Trust was created to act as a vehicle to circumvent applicable insurable interest laws so that the Policy could be controlled by a third-party investor that lacked an insurable interest in Mr. Szalay's life. Additionally, the Trust and Mr. Szalay made numerous fraudulent misrepresentations relating to Mr. Szalay's net worth and annual income, bona fide insurance need for the Policy, the funding source of the Policy premiums and the intent for investors to obtain an interest in the Policy.

13. Because the Policy was fraudulently procured as a mere cover for an impermissible wagering contract, the Policy lacked a valid insurable interest at its inception and is therefore void.

14. Had Phoenix known of the true facts concerning the application, it would not have issued the Policy.

15. As such, Phoenix brings this action for an order declaring the Policy null and void *ab initio*.

B. **The Procurement of the Szalay Policy**

   i. **The Application**

16. Phoenix is, and during all relevant times has been, in the business of underwriting and issuing policies of life insurance and is authorized to transact the business of insurance in the State of Delaware.

17. On or about October 27, 2006, Phoenix received a written application (the "Application") seeking the issuance of an insurance policy with a $10 million face amount insuring Mr. Szalay's life. The Application represented that the Trust, which was created on October 9, 2006, was the proposed owner and sole beneficiary of the applied-for policy. The Trust, by and through its trustee, Berck, executed the Application as the policy owner.

18. In completing the Application, Mr. Szalay and the Trust provided Phoenix with material information regarding, among other things, Mr. Szalay's net worth, the financing of premiums, and income and whether there was any intention that a third-party would obtain an interest in the applied-for policy. In completing the Application, Mr. Szalay and the Trust knew that they were required to provide complete, accurate and honest answers to the questions presented on the Application. Mr. Szalay and the Trust also knew that Phoenix would rely upon the answers recorded on the Application in determining whether Mr. Szalay was insurable and qualified for the insurance sought through the Application.

19. Mr. Szalay and the Trust, through its trustee Berck, responded to clear, direct questions seeking material information regarding Mr. Szalay's net worth and annual income. In response to these questions, the Application represented that Mr. Szalay had a net worth of $100,000,000+ and annual income of $500,000+. Additionally, the Application represented that there was no intention that any third-party would obtain any right, title or interest in the applied-for policy, and that there would be no financing method utilized to pay the premiums in order to facilitate a current or future transfer or assignment with respect to the benefits of the applied-for policy. Finally, it was also represented that the Trust planned to pay $544,050 in first year premiums. As discussed more fully in the ensuing paragraphs, these representations were false,

were material to Phoenix's acceptance of the risk assumed, and were made with the intent that Phoenix rely upon them in issuing the Policy.

> 20. The Application contained the following affirmation:
>
> > I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded.

Mr. Szalay and the Trust, through its trustee, Berck, executed the Application on or about October 20, 2006 and October 23, 2006 respectively. The Application represented that Berck, on behalf of the Trust, signed the Application in the state of Delaware.

> 21. Along with the Application, Mr. Szalay and the Trust executed a Statement of Client Intent Form (the "SOCI"), which requested material information regarding, among other things, the purpose of the insurance, the use of premium financing, whether the Policy was being purchased in connection with a program under which the Trust or Mr. Szalay had been advised of the opportunity to transfer the Policy, and whether the insured was financially induced in connection with the purchase of the Policy. In response to the SOCI questions, Mr. Szalay and the Trust represented that the Policy was being purchased for "estate planning" purposes, that premiums would not be financed, that the Policy was not being purchased in connection with a program through which the Trust or Mr. Szalay had been advised of the opportunity to transfer the Policy within the first five years of its issuance, and that neither the Trust nor Mr. Szalay was being paid cash or other inducement in connection with the application for the Policy. These representations were false, were material to the risk Phoenix assumed, and were made with the intent that Phoenix rely upon them when issuing the Policy.
>
> 22. The SOCI contained the following affirmation:

> By signing below, I declare that the statements made are complete and true to the best of my knowledge.

Mr. Szalay and the Trust, through its trustee, Berck, executed the SOCI on or about October 20, 2006 and October 23, 2006 respectively.

### ii. The Issuance of the Szalay Policy

23. On the basis of the statements and representations contained on the Application and SOCI, and in reliance upon Mr. Szalay and the Trust's complete candor, honesty and openness in disclosing information in response to the questions presented during the application process, Phoenix offered the Policy to the Trust, with a planned first year premium of $544,050, a policy date of November 3, 2006, and face amount of $10,000,000. The Policy is governed by Delaware law.

24. In order to place the Policy in force, Phoenix required that it receive an executed policy acceptance form and payment of premium. On or about November 10, 2006, Mr. Szalay and the Trust, through its trustee, executed the policy acceptance which represented it had been signed in Delaware. Phoenix subsequently received payment of premiums.

25. On or about February 26, 2010, the ownership of the Policy was formally transferred to Villa Capital, LLC. On or about March 10, 2011, the ownership of the Policy was formally transferred to the ESF Trust.

### C. Phoenix's Investigation of the Szalay Policy

26. Upon investigation, Phoenix learned that the representations made on the Application and SOCI concerning Mr. Szalay's net worth, income, the purpose of the insurance, source of funding for the Policy premiums, and whether there was any intent or understanding that a third-party would obtain an interest in the Policy were each false. Mr. Szalay and the Trust

knew that said representations were false, and intended that Phoenix rely on these false representations when issuing the Policy.

27. Contrary to the representations contained on the Application, Mr. Szalay did not have a net worth of $100,000,000 or annual income of $500,000. Upon information and belief, Mr. Szalay has no significant assets. Mr. Szalay and the Trust knew that Mr. Szalay did not have a net worth of $100,000,000 or annual income of $500,000 at the time they executed the Application, but falsely recorded this information on the Application in order to obtain a life insurance policy for which Mr. Szalay was not qualified.

28. Without assets approaching the value described in the Application, Mr. Szalay could not afford the $544,050 first year premium payment scheduled for the policy. Upon information and belief, Mr. Szalay did not fund the payment of the premiums. Further, upon information and belief, Mr. Szalay and the Trust knew that Mr. Szalay would not be the funding source for the Policy premiums, and that the premiums would in fact be funded by a third-party investor without an insurable interest Mr. Szalay's life. Mr. Szalay and the Trust falsely denied that payment of premiums would be arranged through a program designed to facilitate a transfer of the Policy in order to disguise the fact that the premiums would be paid by a third party investor who lacked an insurable interest in Mr. Szalay's life.

29. Upon information and belief, Mr. Szalay and the Trust intended to immediately sell the Policy to a third-party investor. Mr. Szalay and the Trust made false representations to the contrary in order to obtain the Policy.

30. Upon information and belief, Mr. Szalay and the Trust knew that there was an understanding or agreement that a party other than the Trust would obtain a legal or equitable

right, title or interest in the Policy. Indeed, the ESF Trust did obtain rights to the Policy. Mr. Szalay and the Trust made false representations to the contrary in order to obtain the Policy.

31. Upon information and belief, Mr. Szalay and the Trust knew that Mr. Szalay or the Trust would receive cash or other inducement in connection with the application for and purchase of the Policy. Mr. Szalay and the Trust made false representations to the contrary in order to obtain the Policy.

32. Upon information and belief, Mr. Szalay and the Trust knew that the Policy was being purchased with the intent that a third-party investor, which lacked an insurable interest in Mr. Szalay's life would obtain an interest in and control over the Policy. Mr. Szalay and the Trust made false representations to the contrary in order to obtain the Policy.

33. Had Mr. Szalay and the Trust provided accurate responses on the Application and SOCI regarding these items, Phoenix would not have issued the Policy.

34. Phoenix has suffered damages as a result of the Trust's fraud and misrepresentations, including compensation paid to insurance brokers, internal costs incurred in placing, administering and servicing the Policy, and costs incurred in investigating and seeking a declaration that the Policy is void.

35. Phoenix brings this action seeking an order that the Policy is null and void *ab initio*.

## DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST

36. Phoenix incorporates herein by reference each of its allegations contained in Paragraphs 1–35 above.

37. Pursuant to the Federal Declaratory Judgment Statute, 28 U.S.C. § 2201, Phoenix seeks a declaratory judgment that the Policy is null and void *ab initio* due to the lack of an

insurable interest and as an illegal wagering contract. The Policy was purchased with the intent to benefit a third party investor, which lacked the requisite insurable interest in Mr. Szalay's life at the time of the Policy's issuance. Neither Mr. Szalay nor any person with an insurable interest in his life funded payment of the premiums on the Policy. The Policy's issuance violates the letter and spirit of Delaware's insurable interest laws and is inconsistent with the state's public policy of prohibiting wagering on the lives of others. The application for and purported ownership of the Policy by the Trust was merely a sham transaction intended to circumvent applicable insurable interest laws and public policy. The Policy is, therefore, void *ab initio* and is of no force and effect from its inception.

38. Phoenix hereby fully and unconditionally tenders the Policy's premiums to the Court's registry.

39. Notwithstanding paragraph 38, Phoenix seeks an order that it may retain all premiums paid on the Policy.

WHEREFORE, Phoenix demands judgment against the ESF Trust as follows:

  a. An order declaring and adjudging the Policy of life insurance bearing Policy Number 97519439 to be null and void *ab initio*;

  b. an order that Phoenix deposit with the Clerk of the Court all premiums paid on the Policy along with the required interest, if any;

  c. an order that the Clerk of Court return to Phoenix all of the premiums deposited with the Court or, alternatively, an order that the Clerk of the Court pay to Phoenix from the premiums deposited an amount equal to: 1) the compensation paid by Phoenix to any brokers arising out of or relating to the sale of the Policy; and 2) any damages incurred by Phoenix as a

11

result of the Policy's issuance and subsequent investigation, including attorneys' fees and expenses;

d. reasonable and necessary attorneys' fees and other costs incurred in this action;

e. pre-judgment and post-judgment interest at the maximum lawful rate;

f. costs of court; and

g. such other and further relief as the Court deems equitable and just to Phoenix.

Dated: March 15, 2012

/s/ Joseph J. Bellew
Joseph J. Bellew (No. 4816)
COZEN O'CONNOR
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
Email: jbellew@cozen.com

*Attorneys for Plaintiff*
*PHL Variable Insurance Company*

*Of Counsel*:
Thomas F.A. Hetherington, Esq.
Jarrett E. Ganer, Esq.
EDISON, McDOWELL & HETHERINGTON LLP
Phoenix Tower
3200 Southwest Freeway, Suite 2100
Houston, TX 77027
Telephone: (713) 337-5580